WILSON'S HEIRS    do not decide, would not be a ground for declaring it
*vs*
WILSON, &c,    void in this action.

*B. Y. Owsley* for plaintiff.

---

CHANCERY.          Wilson's Heirs *vs* Wilson, &c.

*Case* 65.          ERROR TO THE FLEMING CIRCUIT.

*Frauds. Trusts. Infants. Limitation.*

*January* 31.    CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

In 1823, Mary Wilson, a widow, purchased 83 acres
and 113 poles of land from Wm. P. Fleming, at the
price of five dollars per acre, in Commonwealth's Bank
notes, and received his bond for a conveyance when the
purchase money should be fully paid. In 1828, Mary
Wilson died in possession of the land, leaving a part
of the purchase money unpaid. In September, 1831,
Fleming filed his bill against the heirs of Mary Wilson,
and obtained a decree for the sale of the land, or so
much as might be necessary to pay the unpaid purchase
money, appearing on the face of the decree to be $158
75, with interest from the 20th day of June, 1823, until
paid, subject to a credit of $40, paid October 3d, 1825,
and $10 paid October 1st, 1826, as shown on the note.
The commissioner was directed to advertise, &c., to sell
on a credit of three months, for Commonwealth's Bank
notes, and to take bond, &c.; and the complainant was
directed to convey to the purchaser. The commission-
er's report, dated 29th of October, 1831, states that
the sale was advertised as directed, that on the day of
sale the decree was credited, by directions of the com-
plainant, by the entire sum decreed, except $41, that for
that sum the whole tract was sold to John G. Hicks,
who settled the same with the complainant, by whose
direction no bond was taken. In March, 1832, this re-

port was confirmed, and the complainant again directed to convey to the purchaser, which he did by deed, dated in April, 1833, and acknowledged before the Clerk of the County Court. In December, 1836, Hicks conveyed the same land for $600, to Elijah Shephard, who is still in possession.

. It appears that Mary Wilson left nine children, and heirs, who are still living. Seven of these heirs, by bill and amended bills filed in 1847, alleging that they were infants at the time of the decretal sale, charge that the entire proceeding in which the sale was affected, was not only erroneous, irregular and void, but that it was instituted and carried on to its consummation under a fraudulent combination between one or both of the adult heirs of their mother and the complainant, Fleming, the commissioner, Newcomb, and the purchaser, Hicks, with a view, or at least with the effect of depriving them of their interest in the land; and averring their own ignorance until within a few months before the filing of their bill, not only of their rights, but of the facts and of the injury done to them, but charging that Shephard had notice of them before he made payment and obtained his deed from Hicks, they claim that on the ground of fraud or trust, they are entitled to their portions of the land as heirs of their mother, and pray that it may be decreed to them with the rents for the time it has been withheld, or that if Shephard should be protected as an innocent purchaser, they may have against their two co-heirs, and Hicks, and the representatives of Fleming and of Newcomb, all of whom are parties, a decree for the value of their portion of the land, with interest, &c.

The essential facts which constitute the injury complained of, are that while the whole tract of land was bid off under the decree at the price of $41, which was much less than a tenth of its value, and the sale for that sum was reported to, and confirmed by the Court, and made the basis of a conveyance of the title in satisfaction of the Fleming bond, and of the equity which descended to the heirs of Mrs. Wilson, the obligee, this was in fact done under and in consequence of a

prior agreement between Hicks, the intended and actual purchaser, and Joseph Wilson, the adult male heir, and perhaps Judith Wilson, the adult female heir, for the payment to the former of the additional sum of $425, and to the latter of the sum of $100—that these sums were actually paid to, or for these two heirs, as the means, and principle consideration for procuring the entire title, without making or securing any conpensation to the complainants for their interests thus intended to be extinguished. And as the decree for a sale in Fleming's suit was evidently obtained by arrangement with the adult heirs, and the sale itself was made use of to effectuate their agreement with Hicks, it is charged that the complainant, Fleming, and the commissioner, Newcomb, having co-operated in producing the injurious result, are, as well as the parties who profited by it, liable to make compensation for the injury.

As it is entirely certain that the land was not purchased for the sum of $41, reported by the commissioner, but for a much larger sum, admitted by Hicks to have been paid by agreement with Joseph Wilson and others, it is obvious that while the commissioner's sale for $41 was used as the means of passing the legal title in apparent compliance with the equity of the complainants and their co-heirs, and apparently in extinguishment of it, the real purchase was for a much larger sum, and by private or individual arrangement. The real subject of the private as well as the public sale, was the equity of all the heirs, which was perfect except for the charge of $41, a part of the purchase money less than one tenth of its value, and which could probably have been raised by a sale of one tenth of the land. Suppose, instead of paying to one or two of the heirs, in the absence of the others, who were infants, a large sum for their consent, that the whole tract should be sold for the sum decreed, the purchaser had, without the knowledge of the owner, paid that sum to an opposing bidder for the same purpose, and had thus become the purchaser, would he not hold the land in trust for the owner, except to the extent of the ostensible sum for which it was sold under the decree?

Hicks being apprised of the equity of the heirs, could not by any arrangement with such of them as were present, extinguish the equity of those who were absent, merely on the ground that they were co-heirs, and much less on the ground that they were infants. He could not fairly extinguish their equity, except by purchasing it from them or their agent, and he could not repel it except by some fair claim against the land, or at least against them personally. If he intended to acquire the interest of the absent heirs, by the arrangement with Joseph Wilson, he did not acquire it any farther than the acts of Joseph were authorized, or ratified by the others, unless indeed they have derived some benefit from those acts which makes it inequitable that they should undo them. Such a purchase can be no more effectual against them than if Joseph had been an entire stranger undertaking to dispose of their interest. If on the other hand, the arrangement was made with Joseph for his own benefit, or for that of himself and Judith, without respect to the interest of the other heirs, but with the intention of extinguishing their interest by means of the decretal sale, without further benefit to them than by the payment of the $41, this intent was fraudulent, and could only be made effectual against them by their consent or laches.

Hicks does not intimate that he was unapprised of the equity descended from Mrs. Wilson to her heirs, and indeed it was shown by the proceeding itself. But he alleges that on coming to the sale he found numerous creditors of Mrs. Wilson, desirous of making their debts—that Mrs. Wilson had died hopelessly insolvent, and it was agreed between said creditors and Joseph Wilson, that it was better that the whole tract should be sold, and the excess above the decree be applied to the demands of said creditors, whereupon he bid the $41, and immediately obligated himself to pay $425 in addition, to be paid to said creditors, which sum he says he did pay, and he exhibits the receipt of Joseph Wilson to himself as evidence, and he claims that he should at least occupy the place of those creditors for whose benefit the land was sold.

WILSON'S HEIRS
vs
WILSON, &c.

A tract of land was sold for a. consideration due (about $41;) the defendants were infants except two, who, for a consideration paid to them by the purchaser permitted the whole tract (81 acres) to be sold to pay the $41—Held that the purchaser held in trust for the infants & should surrender upon being indemnified for his outlay, &c., but as an innocent purchaser from the first purchaser was protected, and the first purchaser made responsible pecuniarily.

Whatever might be the merit of this claim upon the statements of the answer, it is not to any extent sufficiently sustained, and is to a considerable extent contradicted by the proof. The receipt states, and therefore, as against Hicks, who produces it, tends to prove a payment of the whole sum of $425 to Joseph Wilson. The oral testimony conduces to prove as against him, that he had agreed some time before the sale, to pay a portion of the price of the land to Joseph Wilson, in a horse and other property, to the value of $130. The only debts shown to have been paid by Hicks, on account of the land, beyond the $41 due under the decree, were debts of Joseph Wilson to the amount of about $130. There is no evidence that any debt of Mrs. Wilson was paid, or that there was in fact any demand against her, except the small balance due for the land. Of the numerous creditors who are said to have had claims against her at the sale, not one has been found. But of the two claims said to have remained unsatisfied because the land would not pay them all, one is produced, and turns out to have been a claim against the husband of Mrs. Wilson, who was dead before her purchase of the land; and the other appears to have been a debt of Joseph Wilson's.

Under these circumstances we cannot doubt that if Hicks had retained the land the complainants would have been entitled to reclaim their respective interests in it, subject only to the proportional burthen of the $41, with interest, which was due on account of the original purchase money. But as the legal title passed by Fleming's deed to Hicks, and Shepherd purchased from the latter and received a conveyance, without notice of the equity against him, whether arising from fraud or trust; and as the land, therefore, cannot be made subject, in his hands, to that equity, Hicks, whether he is to be regarded as a fraudulent purchaser, or as a vendor who violated his trust by selling the land, is in either case, personally liable for the injury which he has done to the complainants. Having received and enjoyed, and sold the very property to which the complainants were entitled, and in violation of their rights, he

cannot protect himself against the consequent liability, on the ground however true, that he supposed the land was liable for the debts which he agreed to pay, and that the arrangement by which it was subject to them, though irregular, was not unjust or injurious. It was his duty, as the person acquiring the property, to know that the facts existed which might relieve his conduct from the charge of flagrant injustice and injury, and to take care that the price paid by him was so applied as to affect the equity of the complainants. But Fleming, who had a real claim, to which the land was justly subject, and Newcomb, who made the sale as commissioner, under the appointment of the Court, stood in a different condition. And although they may have known that there was a private arrangement for a sale of the land under the decree, for more than the sum decreed, and even if the proceeding was instituted and carried on with a view of affectuating such arrangement, yet as they had no interest in this arrangement, were to gain nothing by it, and did not acquire any interest in the land, they should not be held liable as co-operators in producing the injurious result, unless they knew, not only that the effect of the proceeding would be to extinguish the equity of the complainants, but also that this equity was not justly subject to the object proposed to be accomplished by the arrangement, and should not be affected by it. It is sufficient to relieve them from the charge of fraud or of intentional injustice or injury, that they did not know that the claims which were to be satisfied by the private arrangement, were not such as might reach the equity of the complainants, and that they, in good faith, supposed that they were such. They were not bound to institute an exact scrutiny into the nature of these claims, nor to see to the application of the money. They had sufficient ground for selling the land for the amount decreed. And as it seems to have been generally understood that the claims intended to be satisfied by the excess privately agreed on by other parties, were such as might bind the land, and as the relation of Joseph Wilson to the rest of the family, of which he was the head, gave plausible ground for sup-

posing that no injury was intended or would result to them, and that the land was, in truth, to be subjected only to the just claims against it or its owners, which could not, in any other way, be satisfied, we are of opinion that Fleming and Newcomb could not be held liable on the ground that the claims which were to be and which, in fact, were satisfied by the private arrangement, turn out as now appears to have been, claims against Joseph Wilson only. The pretext of an honest mistake cannot, however, avail Hicks either in point of law or in point of fact. Even before the sale, he had arranged modes of payment which he must have known would be exclusively beneficial to Joseph Wilson, and the payments after the sale, so far as shown, were to or for him. He, therefore, is held to be liable for the injury. And as upon the pleadings, it is to be assumed as against him, that the complainant had discovered the facts and their rights, but a few months before the filing of their bill, and as in case of injuries remediable in equity alone, on the ground of fraud or trust, time does not run as a bar until the facts constituting the fraud or breach of trust, are known, or should have been known to the party injured; and as in this case it does not appear that there was any circumstance known to the complainants, which should have led them to such inquiry as would have put them in possession of the facts which occurred during the infancy of at least six of them, we are of opinion that neither the statute of limitation nor the lapse of time can operate as a bar to their claim. But as the lapse of time has probably rendered it impossible for Hicks to establish satisfactorily in all cases, the purposes to which his payments were applied, and as from the condition of the family of which Joseph Wilson was the head, it may be presumed that some portion of his indebtedness may have been incurred for the benefit of all, we are not disposed to give to the complainants the entire advantage resulting from loss of evidence, or to exercise extreme rigor in measuring the extent of the responsibility devolving on Hicks.

It appears that by the arrangement with Joseph Wilson, $426 was to be paid for the land in addition to $41 due under the decree, making in the aggregate, $466, which may be assumed as a reasonably fair consideration at the time. Of the $425, Joseph Wilson was entitled to one ninth, being $47 22, which leaves $77 78. From this sum should be deducted $100 paid to Judith Wilson, which includes, besides her ninth part, an excess of $52 78, which, as she is shown to have used extraordinary exertions and prudence in supporting the younger part of the family, may be regarded as paid for their benefit. The remaining $277, may, we think, be fairly reduced to $225, on the presumption that a portion of it went in discharge of debts incurred for their benefit, though of the family, in the name of Joseph alone. And this balance of $225, with interest thereon from the 8th of August, 1832, the date of Joseph Wilson's receipt, should have been decreed to the complainants. The sum of $100 paid to Judith Wilson, we deduct from the sum of $425, because it does not appear to have been included in the price agreed on, and for which the sale was made, but to have been paid sometime afterwards, voluntarily, in aid of her efforts for the family, and in consideration of the land having appreciated after the purchase.

We have not noticed specially, the error assigned in the record of the suit of Fleming, under which the land was sold and conveyed, because the errors and irregularities in that proceeding, are not such as either to make the sale void, or to prove fraud on the part of the complainant, Fleming.

Wherefore, the decree is reversed and the cause remanded for a decree as above directed.

*Meeker* for plaintiff; *Cord and Andrews* for defendants.